UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION ) | | |
| OF THE UNITED STATES OF AMERICA ) | M.J. Nos. | 19-5048-JGD |
| FOR A CRIMINAL COMPLAINT ) | | 19-5049-JGD |
| CHARGING ENCEBIO ESPERITUSANTO ) | | 19-5050-JGD |
| WITH A VIOLATION OF 21 U.S.C. §§ 846 ) | | |
| AND 841(b)(1)(B)(iii); ) | | |
| ) | | |
| IN THE MATTER OF AN APPLICATION OF ) | | |
| THE UNITED STATES OF AMERICA FOR A ) | | |
| SEARCH WARRANT FOR 3 NEWTON ) | | **FILED UNDER SEAL** |
| STREET, APARTMENT 2, LAWRENCE, ) | | |
| MASSACHUSETTS 01843; ) | | |
| ) | | |
| AND ) | | |
| ) | | |
| IN THE MATTER OF AN APPLICATION OF ) | | |
| THE UNITED STATES OF AMERICA FOR A ) | | |
| SEARCH WARRANT FOR 141 NEWTON ) | | |
| STREET, FIRST FLOOR, LAWRENCE, ) | | |
| MASSACHUSETTS 01843 ) | | |

AFFIDAVIT IN SUPPORT OF APPLICATION

I, Special Agent Jill Hardie, being duly sworn, depose and state that:

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of

Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal

laws and duly authorized by the Attorney General to request a search warrant. I have been

employed as a Special Agent with the Drug Enforcement Administration ("DEA") since

September 2016. I currently am assigned to the New England Field Division's Task Force 1

located in the Boston Office. Prior to my employment as a Special Agent, I was employed as a

DEA Diversion Investigator from May 2012 to August 2016. As a Diversion Investigator, I was

assigned to the DEA Boston Tactical Diversion Squad, a task force created to disrupt and

dismantle those suspected of diverting licit pharmaceuticals and/or chemicals. Prior to my

employment with DEA, I was employed an Intelligence Analyst at the New York/New Jersey High Intensity Drug Trafficking Area (HIDTA) under Homeland Security Investigation's El Dorado Task Force for three years.

2.      As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have received training regarding narcotics investigations while attending the Basic Agent Academy in Quantico, Virginia, and have attended additional specialized training courses in furtherance of my past and current assignments.

3.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4.      Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not

required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

## PURPOSE OF AFFIDAVIT

5.	I submit this affidavit in support of Applications for:

a.	A Criminal Complaint charging Encebio ESPERITUSANTO with violating Title 21, United States Code, Sections 846 and 841(b)(1)(B)(iii) (conspiracy to distribute 28 grams or more of crack cocaine);

b.	A Search Warrant for 3 Newton Street, Apartment 2, Lawrence, Massachusetts 01843 (hereinafter, "Target Location #1") and certain telephones located therein. Target Location #1 is described as follows: 3 Newton Street, Lawrence, Massachusetts, is a three-story multi-unit apartment complex. The residence is a red brick building with white trim and blue shutters. The front entrance is located on Newton Street and has a small gray shingled roof above it. The front door is brown and is marked with a brass number "3." There is a paved parking area in front of the building. Apartment #2 is located on the first floor, to the left. The door is labeled #2. A full description and photograph of Target Location #1 are attached hereto as Attachment A-1, which is incorporated herein by reference; and

c.	A Search Warrant for 141 Newton Street, First Floor, Lawrence, Massachusetts 01843 (hereinafter, "Target Location #2") and certain telephones located therein. Target Location #2 is described as follows: 141 Newton Street, First Floor, Lawrence, Massachusetts, is part of a two-story two-family residence. The residence has light pink clapboard siding with

white trim. The front entrance is covered by a deck on the second floor. There is one common door for both the first- and second-floor apartments. The front door is painted white and has an outer glass storm door. "141" is displayed in black numbers next to the front door. There is also a rear door that faces onto Carleton Street. The first floor apartment is located on the ground floor of the residence. A full description and photograph of Target Location #2 are attached hereto as Attachment A-2, which is incorporated herein by reference.

Target Locations #1 and #2 are referred to collectively herein as the "Target Locations."

6.       I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports made to me by agents of the DEA and other federal, state, and local law enforcement agencies. I have also reviewed information from a variety of additional sources, including a confidential source of information, and consensually recorded telephone calls. For the reasons set forth herein, I believe there is probable cause to believe that ESPERITUSANTO has committed a violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B)(iii) (conspiracy to distribute 28 grams or more of crack cocaine). I further believe there is probable cause to believe that evidence of drug trafficking offenses in violation of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute and distribution of controlled substances) and 846 (conspiracy to distribute controlled substances) will be located in the Target Locations. I also believe that evidence of the use of, and control and dominion over the Target Locations will be found therein.

7.       This Affidavit is submitted for the limited purpose of establishing probable cause to believe that ESPERITUSANTO has committed the above offense, and that evidence of criminal activity will be located inside the Target Locations and on cellular telephones located therein. Accordingly, I have not included each and every fact known to me and other law

enforcement officers involved in this investigation.   I have set forth only the facts that I believe are needed to establish the requisite probable cause.

EVIDENCE IN SUPPORT OF PROBABLE CAUSE

8.     In approximately October 2018, agents with the DEA received information about ESPERITUSANTO from a confidential source of information (the "CS").  The CS has been cooperating with law enforcement since 2014.  The CS wishes to remain anonymous out of concern for the CS's safety and that of the CS's family.  The CS is cooperating in exchange for monetary compensation.  The CS has a criminal history that includes driving-related offenses.  The CS's cooperation has led to seizures of drugs and drug proceeds.  Information provided by the CS during the course of this investigation is believed to be reliable.[1]

9.     During the October 2018 debriefing, the CS stated that an unidentified male was distributing crack cocaine in and around Lawrence, Massachusetts.  The CS stated that the unidentified male had recently received a multi-kilogram shipment of cocaine.  Agents

---

[1] During April 2018, the DEA was alerted by a local police department that investigators with that department had identified the CS as a supplier of oxycodone pills.  In particular, local investigators believed that the CS had distributed a small number of pills to an end-user.  When confronted by the DEA, the CS denied the allegation.  The local police department reported that they did not have sufficient information to pursue charges against the CS.  During October 2018, I was notified that a vehicle used by the CS had been used to deliver a sample of drugs as part of a separate DEA investigation.  The target of that investigation has been arrested, and investigators have reported that they do not have any specific evidence of the CS's participation in drug distribution.  As set forth herein, contacts and meetings conducted by the CS as part of this investigation have been recorded and/or monitored by agents.  As a result, I believe that the information provided by the CS in this investigation is reliable.

subsequently identified the male as ESPERITUSANTO based in part on physical surveillance, as described below.

10.     During November 2018, the CS made two controlled purchases of crack cocaine from ESPERITUSANTO and his co-conspirators inside of 277 Salem Street, Apartment 2, Lawrence, Massachusetts 01843.  On February 8, 2019, the CS received a sample of crack cocaine from ESPERITUSANTO outside of Target Location #2, and on February 28, 2019, the CS purchased crack cocaine from ESPERITUSANTO and his co-conspirator inside of Target Location #1.  On that final occasion, ESPERITUSANTO's courier traveled first to Target Location #2 before meeting with the CS at Target Location #1.  These transactions are described below.  In addition, a package addressed to Target Location #2 was seized by a United States Postal Inspector on March 1, 2019.  That package was opened pursuant to a federal search warrant (M.J. No. 19-5044-JGD) and was found to contain approximately one kilogram of a substance that field tested positive for the presence of cocaine.  Finally, on March 7, 2019, one of ESPERITUSANTO's co-conspirators retrieved a package delivered to 53 Lexington Street, Lawrence, Massachusetts, and traveled directly to Target Location #2.  Based on my training and experience, I believe that the package contained cocaine.

### November 8, 2018 Purchase of Crack Cocaine from ESPERITUSANTO

11.     On November 8, 2018, the CS, acting at the direction of law enforcement, contacted ESPERITUSANTO by calling him at telephone number (718) 679-4983.  The call was recorded.  During the call, the CS stated that the CS had "three pesitos," by which the CS meant $3,000 to purchase drugs, and made arrangements to meet with ESPERITUSANTO at Target Location #2.

12.     Prior to meeting with ESPERITUSANTO, the CS and the CS's vehicle were searched by agents for currency or contraband with negative results.  The CS was provided with an audio and video recording device and official agency funds to complete the controlled purchase.  Thereafter, the CS traveled towards Target Location #2.

13.     Agents conducting surveillance observed the CS pick up ESPERITUSANTO. ESPERITUSANTO instructed the CS to drive to 277 Salem Street, Lawrence, Massachusetts. The CS did so and parked the CS's car outside of 277 Salem Street.  The CS and ESEIRITUSANTO then entered into 277 Salem Street and proceeded to the second-floor apartment.

14.     Once they entered the second floor apartment, the CS handed ESPERITUSANTO the official agency funds.  ESPERTUSANTO counted the money, and a male subsequently identified as Brayan LEBRON used a scale to weigh out an off-white rock-like substance. LEBRON then handed the CS the rock-like substance wrapped in cellophane and paper towels. A male subsequently identified as Giovanni BAUTISTA was present inside of 277 Salem Street, Second Floor, while the drug transaction took place.

15.     Thereafter, the CS left 277 Salem Street and proceeded to a prearranged meeting location.  While at the prearranged meeting location, the CS handed agents the cellophane-wrapped rock-like substance the CS had received from LEBRON.  The substance field-tested positive using a TacticID device for the presence of crack cocaine and weighed approximately 100 grams.

### November 21, 2018 Purchase of Crack Cocaine from ESPERITUSANTO

16.     On November 21, 2018, the CS, acting at the direction of law enforcement, contacted ESPERITUSANTO by telephone.  During the call, which was recorded, the CS

requested in coded language to purchase crack cocaine. ESPERITUSANTO instructed the CS to pick him up at 92 Bailey Street, Lawrence, Massachusetts. The CS agreed to do so.

17.     Prior to meeting with ESPERITUSANTO, the CS and the CS's vehicle were searched by agents for currency or contraband with negative results. The CS was provided with an audio and video recording device and official agency funds to complete the controlled purchase. Thereafter, the CS traveled to 92 Bailey Street.

18.     Agents conducting surveillance observed the CS pick up ESPERITUSANTO outside of 92 Bailey Street. ESPERITUSANTO then directed the CS to drive to 277 Salem Street. The CS parked outside, and the CS and ESPERITUSANTO entered into 277 Salem Street and again proceeded to the second-floor apartment. ESPERITUSANTO had keys to the front door of 277 Salem Street and to the door to the second floor apartment.

19.     Once they entered the second-floor apartment, the CS and ESPERITUSANTO encountered BAUTISTA, who appeared to have been sleeping in the apartment prior to the CS's and ESPERITUSANTO's arrival. While inside 277 Salem Street, Second Floor, the CS handed ESPERITUSANTO the official agency funds, and ESPERITUSANTO retrieved an off-white rock-like substance from the kitchen. In the kitchen, ESPERITUSANTO weighed out a portion of the off-white rock-like substance, wrapped it in paper towels, and placed it in a plastic bag. ESPERITUSANTO then placed the plastic bag into a Styrofoam cup and handed the cup to the CS.

20.     After making small talk with ESPERITUSANTO and BAUTISTA, the CS left 277 Salem Street and proceeded to a prearranged meeting location. While at the prearranged meeting location, the CS handed agents the cup containing the rock-like substance the CS had

received from ESPERITUSANTO.  The substance field-tested positive using a TacticID device for the presence of crack cocaine and weighed approximately 100 grams.

February 8, 2019 Receipt of Crack Cocaine from ESPERITUSANTO

21.     On February 6, 2019, the CS, contacted ESPERITUSANTO at telephone number (646) 991-9864.  During the call, which was not recorded, the CS made arrangements to meet with ESPERITUSANTO on February 8, 2019.  On February 8, 2019, the CS again contacted ESPERITUSANTO at telephone number (646) 991-9864.  During the call, which was recorded, the CS asked to meet with ESPERITUSANTO in person.  ESPERITUSANTO instructed the CS to pick him up at 141 Newton Street, which is the location of Target Location #2.  The CS agreed to do so.

22.     Prior to meeting with ESPERITUSANTO, the CS and the CS's vehicle were searched by agents for currency or contraband with negative results.  The CS was provided with an audio and video recording device.  Thereafter, the CS traveled to Newton Street.

23.     Agents conducting surveillance observed the CS pick up ESPERITUSANTO while he was walking down Newton Street.  The CS then drove ESPERITUSANTO to a convenience store located at 273 South Union Street, Lawrence.  ESPERITUSANTO exited the CS's car and briefly entered the convenience store.  When he reentered the CS's car, the CS requested in lightly coded language to obtain a sample of crack cocaine for a new customer.  At that time, ESPERITUSANTO directed the CS to return to 141 Newton Street to get the sample of drugs.

24.     Agents observed the CS drive to 141 Newton Street and park outside. ESPERITUSANTO then exited the CS's car and went into the front door of 141 Newton Street. Approximately ten minutes later, agents observed ESPERITUSANTO exit the rear door of 141

9

Newton Street and reenter the CS's car. While inside the car, ESPERITUSANTO handed the CS a small plastic baggie containing two plastic bags; one contained a rock-like substance and the second contained what ESPERITUSANTO stated was a cutting agent. While the CS was with ESPERITUSANTO, ESPERITUSANTO told the CS that he receives approximately 3-4 kilograms of cocaine in the mail, and that he sells 1-2 kilograms whole and breaks up 1 kilogram into smaller quantities for redistribution. The recording device used by the CS malfunctioned, and the transaction was not recorded.

25.     Thereafter, ESPERITUSANTO exited the CS's car and the CS proceeded to a prearranged meeting location. While at the prearranged meeting location, the CS handed agents the plastic bag containing the rock-like substance and cutting agent the CS had received from ESPERITUSANTO. The rock-like substance field-tested positive using a TacticID device for the presence of cocaine and weighed approximately 62 grams, including packaging.

<u>February 28, 2019 Purchase of Crack Cocaine from ESPERITUSANTO</u>

26.     On February 28, 2019, the CS, acting at the direction of law enforcement, contacted ESPERITUSANTO by calling him at telephone number (646) 991-9864. During the call, which was recorded, the CS asked if ESPERITUSANTO had "pedrito," by which the CS meant cocaine, available. The CS further stated that the CS needed "50," by which the CS meant fifty grams. The CS asked if the CS should go to Target Location #1 to obtain the drugs, and ESPERITUSANTO agreed.

27.     Prior to meeting with ESPERITUSANTO, the CS and the CS's vehicle were searched by agents for currency or contraband with negative results. The CS was provided with an audio and video recording device and official agency funds to complete the controlled purchase. Thereafter, the CS traveled to Target Location #1.

10

28.     Meanwhile, agents conducting surveillance outside of Target Location #2 observed an unidentified male arrive at Target Location #2.  The unidentified male entered inside of 141 Newton Street, Lawrence, Massachusetts, and remained inside for approximately one minute.  Thereafter, he exited 141 Newton Street carrying a white plastic bag and traveled directly to Target Location #1.  The unidentified male met with the CS outside of Target Location #1.  They then entered 3 Newton Street together and went to Apartment 2 (Target Location #1).  While inside Target Location #1, the unidentified male handed the CS a green cellophane-wrapped package containing a clear plastic baggie with a white rock-like substance inside.  The CS handed the unidentified male the official agency funds.

29.     The CS subsequently left Target Location #1 and proceeded to a prearranged secondary meeting location.  While at the secondary meeting location, the CS handed agents the green cellophane-wrapped package the CS had received from the unidentified male.  The substance field-tested positive using a TacticID device for the presence of cocaine and weighed approximately 50 grams.

<u>March 1, 2019 Seizure of One Kilogram of Cocaine Shipped to Target Location #2</u>

30.     On March 1, 2019, a United States Postal Inspector obtained a federal search warrant for a United States Priority Mail package addressed to Target Location #2.  The package was addressed to "Jhom Castro, 141 Newton St Apt 1, Lawrence MA, 01843."  It was shipped from Puerto Rico.  Upon executing the search warrant, the Postal Inspector seized approximately one kilogram of a substance that field tested positive for the presence of cocaine from the package.

31.    On March 7, 2019, agents conducted surveillance as a United States Priority Mail package suspected of containing cocaine was delivered to 53 Lexington Street, Lawrence, Massachusetts.  Prior to delivery of the package, agents learned that a review of Postal Service business records showed that the same unique individual or device had queried the delivery status of the package seized on March 1, 2019, and the package destined for 53 Lexington Street on March 7, 2019.  The package destined for 53 Lexington Street was shipped from San Juan, Puerto Rico.[2]  Based on my training and experience, I believe that the package contained cocaine and was shipped to an alternate address following the seizure of the package containing cocaine on March 1, 2019.

32.    Prior to delivery of the suspect package, agents observed that LEBRON was parked outside of 53 Lexington Street and was sitting low in his car, as if he were trying to avoid being seen.  LEBRON remained outside of 53 Lexington Street for approximately six hours.  He left briefly to go to a bodega located down the street, and he approached multiple mail carriers who entered the area.

33.    At approximately 6:19 p.m., LEBRON approached a letter carrier at Fern and Saratoga Streets in Lawrence.  Agents observed LEBRON and an unidentified male speak with the letter carrier and enter the rear of the mail truck.  LEBRON and the unidentified male then

---

[2] The same unique individual or device also queried packages shipped from Puerto Rico and delivered to 277 Salem Street, Apartment 3, Lawrence (delivered January 26, 2019); 141 Newton Street, First Floor, Lawrence (Target Location #2) (delivered February 19, 2019); and 277 Salem Street, Lawrence (delivered February 19, 2019), among others.

exited the mail truck; LEBRON was carrying a white postal Priority Mail box. Agents observed

LEBRON enter his car with the unidentified male and travel directly to 141 Newton Street,

Lawrence, Massachusetts. LEBRON parked outside, and he and unidentified male entered the

residence. LEBRON was carrying the white Priority Mail box. Immediately after LEBRON

entered the residence, the lights in the first floor apartment (which is Target Location #2) came

on.

34.     The letter carrier logged the package destined for 53 Lexington Street as having

been delivered at Fern and Saratoga Streets in Lawrence at 6:16 p.m. on March 7, 2019.

35.     Based on the foregoing, I believe there is probable cause to believe that

ESPERITUSANTO is engaged in the distribution of crack cocaine. I further believe that

ESPERITUSANTO and his coconspirators use the Target Locations in furtherance of their drug

trafficking activities, and that they store drugs, drug paraphernalia, and/or drug proceeds there.

DRUG TRAFFICKERS' USE OF RESIDENCES
AND CELLULAR TELEPHONES

36.     Based on my training and experience, and the collective experience of other

investigators participating in this investigation, I know that traffickers of controlled substances

frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain

their ongoing drug business. Notably, on February 8, 2019, ESPERITUSANTO departed from

Target Location #2 prior to delivering a sample of crack cocaine to the CS. In addition, the CS

has received crack cocaine from a co-conspirator of ESPERITUSANTO inside of Target

Location #1. I also know that traffickers of controlled substances usually keep, in addition to

drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing

controlled substances, including scales, plastic bags, cutting agents, and utensils at their

13

residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

37. Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences and stash locations of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences or stash locations records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences or stash locations for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

38. Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residences. Such documents include rental or storage property agreements and receipts.

39.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for drug traffickers to conceal at their residences or stash locations either the proceeds from drug sales or monies to be used to purchase controlled substances.  Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences or stash locations.  Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

40.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences or stash locations.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

41.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement.  In an effort to accomplish these goals, drug traffickers often place assets, such as

vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

42.     Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

43.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones. In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking.

44.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic

communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

45. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

46.     I have participated in the execution of numerous search warrants at the residences and stash locations of drug traffickers similar to the target of this investigation.  In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

a.  controlled substances;

b.  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

c.  books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d.  personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e.  cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and

precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.  firearms and other dangerous weapons; and,

i. identification evidence and/or indicia, such as cell phones with particular

   numbers, mail, deeds, leases, rental agreements, photographs, bills, and

   identification documents, that tend to identify the person(s) in residence,

   occupancy, control, or ownership of subject premises and/or subject

   communication devices.

47.     Based on all of the information I have obtained during the course of this

investigation, and for the reasons more specifically set forth herein, I believe that

ESPERITUSANTO is a distributor of crack cocaine, that he and his co-conspirators use the

Target Locations in furtherance of their drug trafficking activities, that they keep drugs, drug

paraphernalia, and/or drug proceeds there, and that evidence of his drug trafficking activity will

be found inside the Target Locations, as well as in cellular telephones seized therefrom.

CONCLUSION

48.     Based on the foregoing, I believe there is probable cause to believe that from at

least on or about November 8, 2018, ESPERITUSANTO has been engaged in an conspiracy to

distribute 28 grams or more of crack cocaine, a Schedule II controlled substance, in violation of

21 United States Code, Sections 846 and 841(b)(1)(B)(iii).  I also believe there is probable cause

to believe that the Target Locations and cellular telephones recovered therefrom presently

contain the items set forth in Attachment B hereto, which is incorporated herein by reference,

and that those items constitute evidence of the commission of criminal offenses, contraband, the

fruits of crime, things otherwise criminally possessed, and property designed or intended for use

or which is or has been used as the means of committing a criminal offense, specifically,

violations of Title 21, United States Code, Sections 841 and 846.  *See e.g., United States v. Feliz*,

182 F.3d 82, 87 88 (1st Cir. 1999).[3]  Accordingly, I respectfully request the Court issue a

Criminal Complaint charging ESPERITUSANTO with conspiracy to distribute 28 grams or

more of crack cocaine, in violation of Title 21, United States Code, Sections 846 and

841(b)(1)(B)(iii), and search warrants for the Target Locations.

      I declare that the foregoing is true and correct.


JILL HARDIE
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me,
this 12th day of March, 2019


HONORABLE JUDITH G. DEIN
United States Magistrate Judge
District of Massachusetts

---

[3]  In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (*citing United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991)(two year-old information relating to marijuana operation not stale)).  As the First Circuit has explained "[b]y its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

Description of the Premises to be Searched

3 Newton Street, Apartment 2, Lawrence, Massachusetts 01843 (hereinafter, "Target Location #1") and certain telephones located therein. Target Location #1 is described as follows: 3 Newton Street, Lawrence, Massachusetts, is a three-story multi-unit apartment complex. The residence is a red brick building with white trim and blue shutters. The front entrance is located on Newton Street and has a small gray shingled roof above it. The front door is brown and is marked with a brass number "3." There is a paved parking area in front of the building. Apartment #2 is located on the first floor, to the left. The door is labeled #2.

The Target Location is depicted below.



## ATTACHMENT A-2

### Description of the Premises to be Searched

141 Newton Street, First Floor, Lawrence, Massachusetts 01843 (hereinafter, "Target Location #2") and certain telephones located therein. Target Location #2 is described as follows: 141 Newton Street, First Floor, Lawrence, Massachusetts, is part of a two-story two-family residence. The residence has light pink clapboard siding with white trim. The front entrance is covered by a deck on the second floor. There is one common door for both the first- and second-floor apartments. The front door is painted white and has an outer glass storm door. "141" is displayed in black numbers next to the front door. There is also a rear door that faces onto Carleton Street. The first floor apartment is located on the ground floor of the residence.

The Target Location is depicted below.



# ATTACHMENT B

## Description of the Items to be Seized

The following is a list of the evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute and distribution of a controlled substance) to be seized:

1. Controlled substances, including but not limited to fentanyl.

2. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances, including records of sales, records of purchases, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

3. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys, and items commonly maintained in vehicles, such as registration, insurance, and identification documents.

4. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7. Cellular telephones in the possession of or used by Encebio ESPERITUSANTO, Brayan LEBRON, or Giovanni BAUTISTA, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking, located in the memory of any mobile telephone, from January 1, 2018 until the present, including but not limited to:

   a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

   b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c. Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

   d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   e. GPS data;

   f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

   i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.